**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:25-CR-00237-CMS |
| | ) | |
| DANIEL PAULINO, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**

COMES NOW Defendant Daniel Paulino, through undersigned counsel, and hereby files the following memorandum for sentencing:

**I.     Background**

On November 12, 2025, Defendant Paulino pleaded guilty to two counts of a three-count Indictment. Counts 1 and 2 charged Wire Fraud, in violation of 18 U.S.C. § 1343. *See* Presentence Report ("PSR"), ¶ 1. Pursuant to the written plea agreement and Rule 11(c)(1)(A), in exchange for the defendant's voluntary plea of guilty to Counts 1 and 2 of the Indictment, the government agreed to dismiss Count 3 also charging Wire Fraud. PSR, ¶ 2. The United States Sentencing Guidelines (USSG) Estimated Total Offense Level has not been agreed to by both parties. *Id.* The parties have agreed that the Base Offense Level is 7, as found in USSG §2B1.1(a)(1). PSR, ¶¶ 2, 26. The parties have agreed that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and 18 U.S.C. § 3553(a).

The defendant disputes the government's contention that a twelve (12) level increase applies under USSG §2B1.1(b)(1)(G). PSR, ¶¶ 2, 27. The government contends that Defendant

Paulino misappropriated at least $307,100.02 from Velda City, Missouri, for personal use, placing the loss between $250,000 and $500,000. PSR, ¶ 7. The actual financial loss to Velda City, however, was $248,929.02 (*Id.*) which falls below $250,000 and would result in a ten (10) level increase as the loss exceeded $150,000, but was less than $250,000. The parties agreed that two (2) additional levels should be added pursuant to §3B1.3 as the defendant abused a position of public trust. PSR, ¶¶ 2, 29. In the Plea Agreement, Defendant preserved the challenge that he meets the criteria at USSG §4C1.1(a) as a Zero-Point Offender and that the offense level should be reduced by two levels. PSR, ¶¶ 2, 32. Defendant does not contest this issue at sentencing.

The Government will recommend a total three-level reduction for acceptance of responsibility and upon motion of the Government stating Defendant has assisted authorities in the investigation or prosecution of the misconduct by timely notifying authorities of his intention to enter a plea of guilty, pursuant to USSG §3E1.1(a) and USSG §3E1.1(b), respectively. PSR, ¶¶ 2, 33, 34.

The Government estimates the Total Offense Level is 18. PSR, ¶¶ 2, 35. Defendant estimates the Total Offense Level is 16. Defendant's Total Criminal History score is 0, which establishes a Criminal History Category of I, according to the sentencing table in USSG Chapter 5, Part A. PSR, ¶ 40. Based upon a Total Offense Level of 16 and a Criminal History Category of I, the guideline imprisonment range is 21 to 27 months.

For the reasons detailed in this memorandum, Defendant Paulino respectfully suggests that a sentence of probation, with such conditions of probation as this Court deems appropriate, will best serve the statutory purposes of sentencing.

## II.    Sentencing Rules

Title 18 U.S.C. § 3553(a) requires this Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. There are four purposes of sentencing[1] and six factors to consider in connection with them.[2] The guidelines are only one factor to consider and deserve no greater weight than any other factor. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Thus, this Court may not presume a sentence within the guideline range as reasonable. *See Rita v. United States*, 551 U.S. 338, 351 (2007). Nor may it presume a sentence outside the guideline range unreasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Furthermore, this Court may not require "extraordinary circumstances" to justify a sentence below the guidelines nor "use a rigid mathematical formula to determin[e] the strength of the justification required for a specific sentence." *Id.* at 47. These rules apply regardless of whether the guideline derives from the United States Sentencing Commission ("the Commission") or a policy determination of Congress. *See Kimbrough*, 552 U.S. at 109-10.

---

[1] The purposes of sentencing are:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2)(A)-(D).

[2] The factors to consider in connection with the purposes of sentencing are:

    (A) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (B) the kinds of sentences available;
    (C) the guidelines promulgated by the Sentencing Commission;
    (D) any pertinent policy statement issued by the Sentencing Commission;
    (E) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and
    (F) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1)-(7).

3

### III.    Paulino's History and Characteristics

Defendant Daniel Paulino was born in November 1973 in Crystal City, Texas. PSR, ¶ 43. His biological mother was a prostitute who was addicted to drugs and alcohol and reportedly prostituted her daughters out to others, but believed he, as a boy, was without value. He was given up for adoption and adopted by his mother's uncle, Julian Paulino, and his wife, Guadalupe (nee Ramirez) Paulino, when he was one day old. The defendant's adoptive father died of a heart attack in 1982, and his adoptive mother died of a heart attack in 1989, when the defendant was a teenager. He then moved to Saint Louis to live with his sister, who had also been adopted by Julian and Guadalupe, but was old enough to be the defendant's mother. *Id.*

Defendant Paulino is married to Saul Zamudio Flores, age 35. They married in Saint Louis County, Missouri on September 28, 2016. PSR, ¶ 45. They have no children. *Id.*

The defendant is 5 feet 10 inches tall and weighs 220 pounds. PSR, ¶ 47. The defendant has been diagnosed with Type II diabetes, hypertension, and high cholesterol, and is treated for HIV. PSR, ¶ 48. He is prescribed a number of different medications. He has no history of treatment for any mental health conditions. PSR, ¶ 49.

Defendant Paulino graduated from Pattonville High School in Maryland Heights, Missouri, in 1992. PSR, ¶ 52. From 1992 to 1993, he attended Sam Houston State University in Huntsville, Texas. PSR, ¶ 53. From 1994 to 2014, he earned 33 credit hours from Florissant Valley Community College in Bridgeton, Missouri. *Id.* However, he never earned a degree. *Id.*

### IV.    The Nature of the Offense

On November 12, 2025, Defendant Paulino pled guilty to two counts of Wire Fraud. PSR, ¶ 1. The investigation into the instant offense began in March 2024, when the police officers for the Velda City Police Department (VCPD) resigned from their jobs because they

4

were unhappy with the bidding process for a new contract for police services and the Pagedale, Missouri Police Department took emergency control of VCPD. PSR, ¶ 9. Defendant was the Chief of Police at that time and had previously been appointed the City Administrator of Velda City. PSR, ¶ 8. According to investigators, the total amount of loss attributed to the defendant is $307,100.02, which includes all Velda City funds that the defendant misappropriated. PSR, ¶ 17. During the same time period, however, the defendant transferred $58,171.00 from his personal or business bank accounts back to Velda City's bank account. PSR, ¶ 18. As a result, the total actual loss suffered by Velda City is $248,929.02. *Id.* On May 2, 2025, Defendant Paulino was arrested by the FBI in St. Louis, Missouri. PSR, ¶ 20.

## V.    Defendant's History and Characteristics Merit Substantial Consideration

In fashioning a "sentence sufficient, but not greater than necessary," to meet the purposes of sentencing, 18 U.S.C. § 3553(a), "district courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.'" *United States v. White*, 506 F.3d 635, 643 (8th Cir.2007) (quoting 18 U.S.C. § 3553(a)(1)). "This mandate includes consideration of a defendant's age and medical condition." *Id.* (affirming variance from Guideline range of 108 to 135 months to impose 72 month sentence of incarceration in child pornography case based on defendant's age (51 years old) and "deteriorating medical condition between his diabetes, his high blood pressure, weakness in his extremities and difficulty in walking").

As noted in the PSR, Defendant Paulino suffers from severe medical conditions, including diabetes and related neuropathy, which require active treatment, and has an immune disorder that requires management through treatment and expensive medications. His glucose levels, which are being actively monitored, put him at high risk and he has been advised that his worsening diabetes symptoms will likely require dialysis in the near future, and pose a high

5

likelihood of future kidney failure. The cost of Defendant Paulino's medication for his immune disorder exceeds $3500 monthly and poses a substantial expense for the Bureau of Prisons. It is unclear whether and how effectively Defendant Paulino's immune disorder treatment to date, which has been very successful to date, will continue during a term of incarceration.

Defendant Paulino is a married gay man and a former police chief. Both his sexual orientation and his prior law enforcement service place him at a heightened risk of abuse or victimization by other inmates or prison staff during any term of incarceration. *See United States v. Shasky,* 939 F. Supp. 695, 697-98 (D. Neb. 1996) (departure granted to homosexual state trooper of diminutive stature and weight upon conviction.)

Defendant Paulino's history and characteristics, including his suffering from multiple serious medical conditions that require timely monitoring and expensive treatment, and his potential susceptibility to abuse and victimization while incarcerated, support that a punishment that minimizes his sentence of incarceration will best effectuate the statutory purposes of sentencing. There is a substantial risk that the effects of incarceration and any time in custody will impact Defendant Paulino in a way that is substantially different from other offenders, particularly in light of his serious health conditions.

## VI.    Defendant Paulino Poses a Reduced Risk of Recidivism

United States Sentencing Commission data support the conclusion that Defendant Paulino poses a reduced risk of recidivism, as compared with other offenders, and suggests that a sentence variance that minimizes any sentence of incarceration is appropriate in this case. *See e.g.,* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 16 (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2004/200405_Recidivism_Criminal_History.pdf (hereinafter "Measuring Recidivism"). The criminal history measure of the guidelines estimates the likelihood of recidivism based on two offender characteristics: prior convictions and prior terms of incarceration. *See* U.S.S.G. §4A1.1 The United States Sentencing Commission's 15-year report, however, concludes that the measure's predictive power would improve if it incorporated additional offender characteristics. *See Measuring Recidivism* at 16.

Recidivism rates decline consistently as the defendant's age increases. *Id.* at 12, 28. Offenders between 21 and 25 years old recidivate at a rate of 31.9%. *Id.* at 28. In comparison, offenders with a criminal history category I over the age of 50 recidivate at the rate of 6.2%. *Id.* Defendant Paulino is currently 52 years old. PSR Identifying Data.

Employment also corresponds to a reduced risk of recidivism. Criminal history category I defendants who were employed in the year prior to the instant offense recidivate at a rate of 12.7%, while those who were unemployed in the year prior to the instant offense recidivate at a rate of 20.6%. *Id.* at 29. Defendant Paulino is currently employed in an administrative capacity for the Hillsdale Police Department in Saint Louis, Missouri. PSR, ¶ 56.

Educational attainment correlates with lower recidivism rates. *See Measuring Recidivism* at 12, 29. Criminal history category I offenders who have not graduated from high school recidivate at a rate of 21.3%. *Id.* at 29. Those who have some college recidivate at a rate of 13.9%. *Id.* Defendant has taken classes at Sam Houston State University and at Florissant Valley Community College. PSR ¶¶ 53.

The offense of conviction here also correlates with lower recidivism rates. Criminal history category I offenders who are convicted of fraud offenses recidivate at a rate of 9.3%. *See*

*Measuring Recidivism* at 30. Those who are convicted of drug or firearms offenses recidivate at rates of 16.7% and 23.7%, respectively. *Id.*

Additional United States Sentencing Commission data support the conclusion that, as a first offender with no prior contacts with the criminal justice system, Defendant poses a further reduced risk of recidivism, as compared with other category I offenders, and suggest that a sentencing variance that minimizes Defendant's potential sentence of incarceration is appropriate in this case. *See e.g.*, U.S. Sentencing Comm'n, *Recidivism And The "First Offender"* (May 2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (hereinafter "*First Offender Report*").

While the Guidelines broadly define "first offenders" as offenders who have no prior convictions or incarcerations, the Commission has recognized that consideration of additional factors will better identify those first offenders who prove *least* culpable, *least* likely to re-offend, and therefore *most deserving* of the leniency recommended by 18 U.S.C. § 994(j); *First Offender Report* at 1. In an ongoing effort to do so, the Commission divided "first offenders" with no criminal history points into three categories: those with (A) no prior arrests, (B) prior arrests but no prior convictions, or (C) prior convictions counted under U.S.S.G. § 4A1.2(c)(2) only. *Id.* at 5. After collecting and analyzing data about the characteristics of offenders in each of the three categories, it concluded that:

> From both culpability and recidivism risk perspectives, group A offenders, with no prior arrests, most strongly meet the conceptual definition of the first offender category. Offenders in group A have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate, 6.8%, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.

8

*Id.* at 17. Defendant Paulino has no history of an arrest prior to commission of the instant offense, so he falls within group A—first offenders who are least likely to reoffend. PSR at ¶ 38.

The Commission's statutory directive requires it to insure that "the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). In following this directive, the Commission has now proposed an amendment that would broaden the reach of Zone B of the sentencing table up to a Total Offense Level of 23 for a Criminal History Category 1 offender. January 30, 2026 Amendment, at 12. This change would authorize a sentence of probation "if it imposes a condition or combination of conditions requiring a period of community confinement, home detention, or intermittent confinement sufficient to satisfy the minimum term of imprisonment specified in the guideline range." *Id.* at 13. Defendant's low risk of recidivism suggests that he is a good candidate to receive a sentence that minimizes any term of incarceration, because such a sentence would not be necessary to achieve the purposes of sentencing.

### VII. Amendments to U.S.S.G. 2B1.1, Which Are Scheduled to Take Effect Beginning in November, 2026, Merit Consideration Here

Beyond the proposed amendments to the sentencing table discussed in the previous section, the Sentencing Commission has proposed amendments to Section 2B1.1 of the federal sentencing guidelines, the specific offense characteristics for fraud and theft at issue in this case. This amendment, which would be effective for sentencings beginning November 1, 2026, would assign offenses with a loss amount between $200,000 and $350,000 a corresponding increase in offense level of 10. (Currently, loss amounts between $250,000 and $550,000 correspond to an increase of 12 levels). The loss amount calculations of both Defendant and the Government would fall within these proposed parameters as corresponding to a 10, and not a 12, level

9

increase under the amendment.[3]

In a similar context of a significant guideline Amendment that had not yet taken effect, the First Step Act's modified safety valve provision, the Sentencing Commission noted that courts were authorized to grant reduced sentences to offenders who would qualify for the new criteria, but did not qualify under the existing guideline at the time of their sentencing:

> Of course, the court has authority under 18 U.S.C. § 3553(a) to grant a similar 2-level reduction to the newly eligible safety valve offenders not meeting the guideline criteria. If the court should do so, it will be considered a variance from the guidelines.

U.S. SENT'G COMM'N, OFF. OF EDUC. & SENT'G PRAC., ESP INSIDER EXPRESS SPECIAL EDITION: FIRST STEP ACT, at 6 (Feb. 2019). Similar logic applies here, and the Court may vary from the guidelines to recognize and counteract the disparity in sentencing ranges between Defendant Paulino and similarly situated defendants with sentencing dates a few months after his sentencing.

## VIII.  Conclusion

Defendant Paulino is a 52-year-old man with significant ongoing health concerns and no prior criminal history, who has successfully complied with all conditions imposed on him while on pretrial release in this case. He has accepted responsibility for his offense and made a payment toward restitution of $7,000.00 in advance of sentencing, an amount that is significant in light of his limited financial resources, as reflected in his PSR, and his substantial monthly medical expenses. His combination of serious health conditions (which require active monitoring and expensive treatment) pose a serious risk that a term of incarceration will affect him, or be

---

[3] Defendant has filed a factual objection to the calculation of his total offense level, objecting to the inclusion of amounts repaid by him in his loss amount. Consideration of the scheduled changes to the loss amount guideline would result in the same total offense level as that made under Defendant's objections to the PSR.

10

costly to the Government, in a way that is substantially different from other offenders and could

leave his health seriously diminished as the result of incarceration. Accordingly, Defendant

Paulino respectfully suggests that a sentence of probation, with such conditions of probation as

this Court deems appropriate, will best serve the statutory purposes of sentencing.[4]

Respectfully submitted,

ROSENBLUM SCHWARTZ FRY & JOHNSON, P.C.

By:     */s/ Marc Johnson*
        MARC JOHNSON, #58065MO
        120 S. Central Avenue, Suite 130
        Clayton, Missouri 63105
        (314) 862-4332/Facsimile (314) 354-8271
        Email: mjohnson@rsfjlawfirm.com
        Attorney for Defendant Paulino

**CERTIFICATE OF SERVICE**

By signature below, I hereby certify that on April 17, 2026, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Assistant United States Attorney Hal Goldsmith.

*/s/ Marc Johnson*

---

[4] Defendant Paulino respectfully suggests that such a sentence be reached as follows: 1) that his objection to the PSR be granted, resulting in a calculation of a Total Offense Level of 16 and a guideline range of imprisonment of 21-27 months imprisonment; 2) that a downward variance be granted from that range to a sentence of probation including a corresponding period of home detention and/or community confinement.

11

**The Honorable Cristian M. Stevens**

**United States District Court**

**111 S. 10th St.**

**St. Louis, Mo. 63102**

**RE:     United States of America v. Daniel Paulino**

**Cause No.:4:25 cr 237 CMS**

Your Honor:

My name is David Callaway and I have known Daniel Paulino as a co-worker, boss and good friend for nearly 20 years.

Having always considered Dan to be a "squared away" person and police officer, I was both troubled and shocked to hear of this crime from Dan just prior to it being announced publicly.  While I understand the seriousness of the case and severity of the charges of wire fraud, I pray the court will show some leniency.

As a boss, Dan was always firm, yet fair. As a friend Dan has always been there for me, no matter how bad things got.  When I almost died of Covid (twice) in 2021, Dan was by my side the entire time, helping my wife and daughters and doing anything he could to help my family out.  Whole-heartedly, I can say that Dan has been a TRUE friend to not only me, but to my family as well.

While Dan has always been a true friend to me, through a series of poor decisions, Dan wound up in the situation he is in.  While completely shocked when hearing about the charges, I knew Dan would be the first one to stand up and take responsibility for his actions.  Dan has expressed remorse to me for his actions and I truly believe in his ability to pay his debt to society.

As a man of faith, I pray for Dan daily.  In addition, I pray that the court will take this letter into consideration at his time of sentencing.  Despite the current case, I still believe Dan is right-minded individual, a valuable member of society, in addition to a good person and even better friend.

Respectfully,

David A. Callaway

Police Lieutenant – medically retired

**The Honorable Cristian M. Stevens**

**United States District Court**

**111 S. 10th St.**

**St. Louis, Mo. 63102**

**RE:    United States of America v. Daniel Paulino**

   **Cause No.:4:25 cr 237 CMS**

Your Honor:

My name is Kelly Callaway and I met Daniel Paulino through my husband Dave Callaway in 2016.

Dave has known Dan quite a few years more than I have, however in the time I have known Dan I have always known him to be a kind-hearted person who would give you the shirt off of his back.  Dan really became a stand-out Thanksgiving of 2021 when my husband was in the ICU for several weeks nearly dying of Covid twice.  It was at this time that I knew that Dan was one of Dave's closest friends.  Doing any and everything he could to help us out while Dave was at the lowest point of his life.

Dan has an addictive personality and an electric persona.  From day one, I always considered Dan a friend.  Hearing of Dan being charged with wire fraud, I was both shocked and let-down; however in speaking with Dan, he immediately and sincerely expressed his remorse to me, acknowledging full responsibility.

Having been through hell with my husband's health in the last five years, I, like Dave have become strong in my faith, knowing many times that my faith was all that I had.

I say this because as a person of faith, I truely believe Dan when he tells me he is sorry for what he has done.  Additionally, Dan did not look to blame anyone else.   He did not make excuses; he owned it.  He knew what he did was wrong and took full accountability for his actions – No games, no lies, no frills, just the honest truth and sincere contrition.

I know that what Dan did was extremely serious.  I pray that the courts will take this character reference into account and show Dan some leniency as I know in my heart that Dan is a good person.

Thank you for your time and consideration.

Sincerely,

Kelly Callaway

**St. Louis, Mo. 63102**

**RE:**    **United States of America v. Daniel Paulino**

   **Cause No.:4:25 cr 237 CMS**

Your Honor:

My name is John Bernsen. I am currently the Chief of Police for the Village of Hillsdale, MO and Dan's boss. I met Dan through our law enforcement partnership some 18 years ago. A couple anecdotes that I recall is when Dan saved the life of 2 people by giving them CPR and continued to give the victims CPR until paramedics arrived. Another is Dan's ability to write grants. Due to that ability, Dan has obtained nearly $1M in grants for the City of Velda City and over $125,000 in grants for the Village of Hillsdale since being employed with me (under 2 years). For a struggling agency, those grants are a life saver to help not only the Village, but to give officers the lifesaving equipment they desperately need. Dan has always thought of his officers and continues to do so today.

Dan is the main financial provider for his household. Jailing Dan would be extremely detrimental to Dan's mental state and his household. Dan has worked since he was 16 years old and has achieved many goals throughout his life. Dan purchased a house in Velda City. Many police officers do not but a home where they work, but Dan was committed in being close to his residents and officers. Despite his situation, Dan has no plans on leaving Velda City. Dan's plan is to make things right and begin his next chapter of his life. With the Courts help, it can be possible.

I still consider Dan to be an honest, ethical, professional and valuable asset. Dan has always been an outstanding person and police officer. I was both troubled and shocked to hear of this crime from Dan just prior to it being announced publicly. While I understand the seriousness of the case and severity of the charges of wire fraud, I pray the court will show great leniency.

There is many positive things I can say about Dan. His knowledge, care, passion and heart has always been law enforcement. There needs to be some GRACE on all the positive things Dan has done over his 30+ years of flawless law enforcement career. Dan provided a full size basketball court for Velda City (and nearby residents) to play and stay off the streets. In this neighborhood, a basketball court is huge for this area to help kids/teens focus on doing right and avoid crime/gangs. Dan also replaced every park equipment in Velda City's park and even started a new park for kids to play. Dan also made Velda City ice salt independent when he had a public works garage and salt bin. Dan even plowed the streets during winter snow storms without any additional pay or recognition. When a fellow co-worker nearly lost his life to Covid, Dan jumped in and got financial assistance to help

ease the burden his officer was facing.  One thing I know Dan does at least 3-4 times a year, Dan pays for groceries to a random person while Dan is shopping at Schnucks and/or Wal-Mart.  Dan just did this to a local resident while a mother was asking for food for her and her daughter.  Despite Dan's situation, he jumped in and had groceries from Wal-Mart to her home.  DAN JUST CARES.  That is the type of person Dan really is.

Dan has expressed remorse to me for his actions and despite that, is worthy of grace and leniency from your Honor.  I assure you Dan is devastated at just how much he has already lost due to his actions.  Dan does not blame anyone but himself and has stated to me he wants to make things right.

I pray your Honor gives Dan leniency by sentencing him to probation and no jail time.  I have spoken with my Mayor, Dorothy  Moore (who has known Dan for nearly 18 years); who mimics the above and has vowed to keep Dan employed with the Village of Hillsdale and help Dan move forward.

Respectfully,

Col. John Bernsen
Chief of Police
Village of Hillsdale

January 5th, 2026

The Honorable Cristian M. Stevens

United States District Court

111 South 10th St.

St. Louis, Missouri 63102

Re: United States of America v. Daniel Paulino

Cause No.: 4:25 cr 237 CMS

Your Honor,

My name is Daniel Windley, a former tenant of Daniel Paulino. I work for the Federal Government in St. Louis, Missouri and I first met Dan in 2021 when answering an ad for a room lease in Spanish Lake, just north of St. Louis. I was new to St. Louis and was seeking a room to rent as my original plan for St. Louis was six months before I would transfer to the East Coast with my agency. I rented the room with Dan well past the six month time frame I discussed with him. I grew quickly to feel at home and became good friends and was happy to stay longer with him as my employment plans for transferring did not come to fruition. I am grateful for the trust and friendship and he also agreed to be a reference when I moved to St. Charles, Missouri in 2023, long after the initial lease expired. Dan never once raised my rent or demand a new lease, which would have been justified. His decision to help me personally came at the expense of a rent increase justified by the amenities his home offered.

Dan's true positive impact in my time of need occurred shortly after I moved into my new rented room in St. Charles. That landlord suddenly changed the terms of the lease which made my tenancy no longer viable. Under Missouri renters' law, I was allowed to terminate the lease and leave; however, the abrupt change completely upended my personal life and left me looking for a new home with 30 days' notice. I called Dan, who at this point had moved to his Velda City house. I explained to him what I was experiencing and he immediately opened his home to me as a tenant once again. The short notice was not a problem at all. He went to great lengths and inconvenience to prepare the room within that short notice. The lease was affordable, beneficial to me, and once again Dan offered terms lower than what he could have justifiably charged. He did all this not for his own income as a renter, but to assist me as a good friend. I had never experienced the scenario I found myself in due to the St. Charles renter and Dan recognized my plight, and I will always be grateful for his selflessness and compassion he showed in my time of need as I truly had no where else to turn.

I understand the crime he was charged with, respect the gravity of the situation and how remorseful he. I am writing to describe my relationship with him and the profoundly positive

impact he has had on me.  I didn't know anyone when I moved to St. Louis for the job I have now and I'm grateful to consider him a friend that I know I can rely on.

Thank you,

Daniel Windley

**The Honorable Cristian M. Stevens**

**United States District Court**

**111 South 10th Street**

**St. Louis, Missouri 63102**


**Re:    United States of America v. Daniel Paulino**

**Cause No.: 4:25 cr 237 CMS**

**Your Honor:**

My name is Dora Elia Navarro and I am Daniel Paulino's sister. I have now been retired for 8.5 years, but prior to that, I worked full-time in Finance and Accounting at various hospital systems throughout the Houston, Texas area. I maintain my license as a Certified Public Accountant in the State of Texas.

Daniel and I share the privilege of having been adopted when we were babies by Julian and Guadalupe R. Paulino, now deceased. Daniel came into our lives later in life and I was actually old enough to be his mother. So, after our parents passed, it was automatic and normal for him to move to the St. Louis area with us, my husband and our three children.

Daniel quickly and easily became a part of our immediate family. Our children loved him and looked up to him as an older brother.

While living with us, he exhibited a real interest and excitement to be involved in law enforcement. He joined the local Bridgeton Explorers group with his ultimate goal of becoming a police officer not far in the future. He achieved that goal in 1995 and we were all so proud and excited for him!

Daniel is a hugely important part of our family and he is like a son to my husband and me. He makes it a point to send us remembrances on Mother's Day and Father's Day. That is why it is so painful for us to learn of this Wire Fraud offense. When he initially discussed it with us, it was difficult for him to express himself to us and I could see that he was truly remorseful. I think he was also upset that he had disappointed us.

As I mentioned previously, he is like a son to me, so I pray for him every single day. I pray that he repents and asks God's forgiveness, with the expectation that he never do anything like this ever again.

The Honorable Cristian M. Stevens

United States District Court

111 South 10th St.

St. Louis, Missouri 63102

Honorable Cristian Stevens,

My name is Randall "Randy" Payette.

I have known the Defendant, Daniel "Dan" Paulino, for over 20 years. He has always been a positive role model in my life.

Dan has helped me achieve my goals in a career in law enforcement. I am currently a K9 Handler for an agency in central Florida with over 1,400 members.

Dan helped me when I resided in Missouri and had a job as a police dispatcher for the city of O'Fallon. I did police ride alongs with him nearly everyday off, continuing my interest to be a sworn law enforcement officer.

Dan was always informative, motivational, and helpful. I learned by how he helped citizens dealing with crisis situations. He always acted with professionalism. I was with him responding to an officer involved shooting that occurred during a ride along and saw him tactically approach and ensure other officers and citizens safety due to being a public place. I have always known Dan to be community service oriented, concerned for others safety and wellbeing.

When I was first starting my law enforcement career, Dan knew I had wanted to move to Houston, Texas at the time. He assisted me with going there, touring their dispatch center and some contacts. I also met his family there and realized how close they were and supportive of each other.

I also know Dan's partner, Saul, and closeness and importance of family members including his niece who recently was going through a stressful divorce proceeding and relied on Dan multiple times for support, information and mental wellbeing.

Dan's misconduct is disappointing to himself, and he shows remorsefulness due to that.

Throughout my entire friendship with Dan, I have always relied on Dan for support as well.

One of my most proud moments was when he was able to complete a police ride along with me, seeing his impression he imprinted to serve the community.

Respectfully

Randall "Randy" Payette